# EXHIBIT 3

14-005613-01-FC FILED IN MY OFFICE Cathy M. Garrett WAYNE COUNTY CLERK 11/2/2021 1:02 PM Lisa Peterson

STATE OF MICHIGAN
CIRCUIT COURT FOR THE COUNTY OF WAYNE
CRIMINAL DIVISION

THE PEOPLE OF THE
STATE OF MICHIGAN,

                                     Criminal Case No. 14-5613-01

        Plaintiffs,

                                      Hon. Mariam Saad Bazzi
v.

MICHAEL DEMOND LAWSON,

        Defendant.

| WAYNE COUNTY PROSECUTOR | LEGAL WARRIORS, PLLC |
|---|---|
| Donna Pendergast (P41015) | Lillian F. Diallo (P52036) |
| Assistant Prosecuting Attorney | *Counsel for Defendant* |
| 3030 W. Grand Blvd. | 500 Griswold Street, Suite 2340 |
| Detroit, MI 48202 | Detroit, MI 48226 |
| (313) 456-0078 | (313) 965-6633 Fax (313) 965-9858 |
| Email: | lilliandiallo@sbcglobal.net |
| | and |
| | WILDER LEGAL GROUP PLC |
| | Marvin D. Wilder (P53871) |
| | 500 Griswold Street, Suite 2340 |
| | Detroit, MI 48226 |
| | (313) 731-6081 Fax (313) 731-6091 |
| | mdwilder@Wilderlegal.com |

## **MOTION FOR RELIEF FROM JUDGMENT**

      Defendant Michael Demond Lawson, by and through his counsel, moves to set aside the judgment in this case, pursuant to MCR 6.500 *et seq.*, and in support of such, states as follows:

      1. Defendant Michael Demond Lawson ("Lawson") was convicted of (i) Assault with Intent to Murder; and (ii) Homicide Murder (Second Degree), following a jury

trial in Criminal Case No. 14-005613-FC. The trial was held in the 3rd Circuit Court for the County of Wayne, the Honorable Craig Strong (Retired) presiding.

2. Lawson was sentenced on March 6, 2015, which was later amended on April 12, 2019, to 37.5 to 75 years, concurrent. Lawson is presently serving that sentence at the Saginaw Correctional Facility in the State of Michigan.

3. A timely notice of appeal was filed on March 23, 2015, and the Michigan Court of Appeals affirmed Lawson's conviction in an unpublished opinion on October 11, 2016. Defendant Lawson was represented by appointed defense counsel Ronald D. Ambrose (P45504).

4. Defendant Lawson now moves this Court to set aside the judgment, and to grant a new trial in this case, based on newly discovered evidence of government suppression of evidence and misconduct. Secondarily, a new trial should be granted because of actual innocence and prejudice.

5. None of the bars against relief from judgment are present:

a. Defendant can no longer proceed directly by appeal by leave since more than 12 months have elapsed from judgment. MCR 6.508(D)(1). At this juncture, the judgment may only be reviewed in accordance with MCR 6.500 *et seq*. Furthermore, MCR 6.502 authorizes a motion for relief from judgment.

b. Defendant has not previously raised these claims in post-conviction proceedings, and these grounds for relief have never been decided against him on the merits. MCR 6.508(D)(2).

c. The issues to be presented are newly discovered evidence from a new

trial of Lawson's co-defendant, Carl Bruner II, which resulted in his acquittal on March 6, 2020.

d. Defendant Lawson's conviction was predicated on alleged aiding and abetting with Bruner's conduct. Some of the other issues could have been raised on appeal, MCR 6.508(D)(3), but Defendant contends that he is entitled to relief because he had good cause for failure to properly raise these issues on appeal, MCR 6.508(D)(3)(a); namely, ineffective assistance of appellate counsel. *People v. Reed*, 449 Mich. 375 (1995); *People v. Hardaway*, 459 Mich. 878 (1998); *People v. Kimble*, 470 Mich. 305 (2004).

6. This motion is based on numerous violations of Defendant Lawson's Constitutional rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Section Seventeen and Twenty of the Michigan Constitution.

7. Specifically, Defendant Lawsons' rights were violated and impermissibly infringed upon where:

a. The prosecution, with the aid and assistance of DPD's officer in charge, Nancy Foster, failed to properly disclose, and in some instances may have even destroyed, potential exculpatory evidence, in violation of DPD policy and Lawson's 14th right to due process, to identify and provide any exculpatory evidence and Brady/Giglio material that would have a reasonable probability of altering the results in a trial, and, relevant to the credibility of a government witness, including and in particular law enforcement officers.

b.  The Officer in Charge (OIC) of the investigation, Nancy Foster, perjured herself during Lawson's trial, stating that she did not have video footage from St. Andrews Hall. Her contention is belied, and impeached, by her own notation in Case tracking notes that were not produced prior to the first trial. In addition, she initially testified at trial that she did receive "a little video surveillance," which was true, but the prosecutor directed her into recanting that statement, contending subsequently in the same trial, that there was no video.

c.  Defendant also presents new evidence that the government's only witness identifying Bruner as the shooter, Wesley Webb, a government informant was coerced, pressured, and coached into identifying Bruner in a photo array.

d.  Webb testified, in the subsequent Bruner trial, that he initially picked the wrong person, and Foster, asking a rhetorical question, "are you sure" while gesturing with her hand on the picture containing Bruner.

e.  Foster compromised the identification process by serving as the administrator of the photo array and being the officer in charge, with no neutral party participating in the process, contrary to best practices.

f.  Webb stated, in the new trial testimony, that it was clear that Foster wanted him to choose Bruner.  Accordingly, Webb, who faced a long jail sentence if he did not fully cooperate, chose Bruner as the shooter.  Indeed, Webb stated that he didn't even believe Lawson's alleged statement about the incident, and he never knew anything about a gun, but Foster placed it in his statement, and he signed it (albeit under duress).

g.  Webb testified in a witness detainer hearing, on February 27, 2020, that he never knew about the first trial. He stated, that although he moved, he was still located in the Detroit area.  He was never subpoenaed and knew nothing about the first trial. In contrast, at the subsequent Bruner trial, Webb was detained to ensure his testimony for trial.

h.  The theory that Bruner was thrown out the club that evening because of an altercation with Ms. Kryianna Weiler is flawed, because Bruner was the wrong person, according to the witness, the incident was at the wrong time, inconsistent with the witness's timeline, and the physical description of the assailant did not match Bruner, as Weiler failed to identify Bruner as the assailant, or Lawson as the friend to the assailant.

i.  Foster and the prosecution forced the evidence to fit Lawson and Bruner because it matched their theory as early as June 21, 2012, the day after the incident, despite a multitude of inconsistencies.  Foster conflated issues related to Bruner and Lawson with the many people who were thrown out the club that evening, a theory based solely from the phone Bruner left inside the club.

j.  As a result of the new evidence presented at the subsequent Bruner trial, which resulted in an acquittal of the alleged shooter, Lawson should be granted relief from judgment and granted a new trial based on Webb's testimony that he was not subpoenaed for the first trial, he was coerced into making a statement against Lawson, and he was coached to identify Bruner as the shooter. Consequently, the case against Lawson, under a theory that he aided and abetted Bruner, is likewise

5

flawed and should be grounds for a new trial.

WHEREFORE, Defendant Lawson prayerfully requests the Court to grant a new trial in this matter in the interest of justice and consistent with the standards set forth in the U.S. Constitution as well as the State of Michigan Constitution.

Respectfully submitted,

____/s/ Lillian F. Diallo _____
LEGAL WARRIORS, PLLC
Lillian F. Diallo (P52036)
*Counsel for Defendant*
500 Griswold Street, Suite 2340
Detroit, MI 48226
(313) 965-6633 Fax (313) 965-9858
lilliandiallo@sbcglobal.net

and

WILDER LEGAL GROUP, PLC
Marvin D. Wilder (P53871)
*Co-Counsel for Defendant*
500 Griswold Street, Suite 2340
Detroit, MI 48226
(313) 731-6081
mdwilder@wilderlegal.com

Date: November 1, 2021

6

STATE OF MICHIGAN
CIRCUIT COURT FOR THE COUNTY OF WAYNE
CRIMINAL DIVISION

THE PEOPLE OF THE
STATE OF MICHIGAN,

                                Criminal Case No. 14-5613-01

        Plaintiffs,

                                Hon.  Mariam Saad

v.

MICHAEL DEMOND LAWSON,

        Defendant.

| WAYNE COUNTY PROSECUTOR | LEGAL WARRIORS, PLLC |
|---|---|
| Donna Pendergast (P41015) | Lillian F. Diallo (P52036) |
| Assistant Prosecuting Attorney | *Counsel for Defendant* |
| 3030 W. Grand Blvd. | 500 Griswold Street, Suite 2340 |
| Detroit, MI 48202 | Detroit, MI 48226 |
| (313) 456-0078 | (313) 965-6633 Fax (313) 965-9858 |
| Email: | lilliandiallo@sbcglobal.net |
| | and |
| | WILDER LEGAL GROUP PLC |
| | Marvin D. Wilder (P53871) |
| | 500 Griswold Street, Suite 2340 |
| | Detroit, MI 48226 |
| | (313) 731-6081 Fax (313) 731-6091 |
| | mdwilder@Wilderlegal.com |

**MEMORANDUM IN SUPPORT OF**

**MOTION FOR RELIEF FROM JUDGMENT**

*Oral Argument Requested*

## TABLE OF CONTENTS

**MOTION FOR RELIEF FROM JUDGMENT** ................................................. i

**TABLE OF CONTENTS** ..................................................................... ii

**TABLE OF AUTHORITIES** ................................................................ iii

**TABLE OF EXHIBITS PRESENTED** ....................................................... v

**INTRODUCTION AND BACKGROUND** ................................................... 1

**APPELLATE HISTORY** ..................................................................... 2

**LEGAL ARGUMENTS** ...................................................................... 4

   *A.*   *Standard of Review* ................................................................ 4

   *B.*   *Brady Violation* ................................................................... 8

   *C.*   *Suppression of Evidence by DPD and the Prosecution* ................ 9
      *1.*   *Suppression of Case Tracking Notes/Progress Notes* .................. 10
      *2.*   *Suppression of Video Tape Evidence from St. Andrews Hall* .......... 11

   *D.*   *Wrongful Conviction Caused by Erroneous Identification* .............. 13
      *1.*   *Failure of DPD to Use Double Blind Procedure as a Best Practice* 14
      *2.*   *DPD Procedure and Policy for Photo Array Identification* .............. 17
      *3.*   *Witness Inconsistencies in Identification of Bruner* ..................... 18
      *4.*   *Foster's Direct Misconduct in the Identification of Bruner* ............ 21
      *5.*   *Webb Should Not be Declared Unavailable* ............................... 23

**CONCLUSION** ............................................................................. 24

## TABLE OF AUTHORITIES

### CASES

#### U.S. Supreme Court Cases

*Brady v Maryland*,
 373 US 83 (1963)..............................................................................................8

*Giglio v. United States,*
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)............................................9

*Kyles v. Whitley,*
 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ....................................9

*Manson v. Brathwaite,*
 432 U.S. 98, (1977),.............................................................................................17

*Napue v. Illinois,*
 360 U.S. 264,  79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).......................................9

*Perry v. New Hampshire*, 565 U.S. 228 (2012)..................................................17

*United States v. Agurs,*
 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)...........................................9

*United States v. Wade,*
 388 U.S. 218 (1967)..............................................................................................17

#### State Court Cases

*Canfield v. City of Jackson,*
 112 Mich. 120, 70 N.W. 444 (1897) .......................................................................5

*Luckhurst v. Schroeder,*
 183 Mich. 487, 149 N.W. 1009 (1914) .................................................................6

*People v Swain,*
 288 Mich App 609, 794 NW2d 92 (2010)..............................................................4

*People v. Armstrong,*
 490 Mich. 281, 806 NW2d 676 (2011).................................................................7

*People v. Barbara,*
 400 Mich 352, 255 NW2d 171 (1977)..................................................................6

*People v. Clark,*
363 Mich. 643, 110 NW2d 638 (1961) ........................................................................6

*People v. Grissom,*
492 Mich 296, 821 NW2d 50 (2012) ...........................................................................5

*People v. Pizzino,*
313 Mich 97, 20 NW2d 824 (1945) .............................................................................5

*People v. Serra,*
301 Mich 124, 3 NW2d 35 (1942) ...............................................................................6

*Spray v. Ayotte,*
161 Mich. 593, 126 N.W. 630 (1910) ..........................................................................6

*State v. Dubose,*
 699 N.W.2d 582 (Wis. 2005) ......................................................................................13

## COURT RULES

MCR 6.500 ......................................................................................................................6

## TREATIES

58 Am.Jur.2d, New Trial, s 175, p. 391 ......................................................................9

## OTHER AUTHORITIES

*Michael Cicchini, Joseph G. Easton, Reforming the Law on Show-Up Identifications,*
 100 J.Crim. L. & Criminology 381, 385 (2010) .........................................................15

*Michigan Commission on Law Enforcement Standards, Eyewitness Identifications,*
 *April (2014)* ...............................................................................................................17

*MPTC, June 2017, Executive Law 837 (21).* ...............................................................16

*Prosecuting Attorney Assoc of Michigan, April (2015)* ...............................................18

## TABLE OF EXHIBITS PRESENTED

EXHIBIT 1, TR Bruner Trial 2, 3/2/2020 Webb

EXHIBIT 2, Witness Detainer Hearing, 2/27/2020 (Re: Wesley Webb)

EXHIBIT 3, DPD Policy Directive 102.10.

EXHIBIT 4, DPD Case Tracking Notes or Progress Notes

EXHIBIT 5, TR Bruner Trial 2, 3/3/20 Foster (OIC)

EXHIBIT 6, Lawson Trial, 11/26/2014, TR Foster (OIC)

EXHIBIT 7, Prosecution Witness List

EXHIBIT 8, Webb Proper Agreement

EXHIBIT 9, State Bar of Michigan,
           Law Enforcement and Eyewitness Identifications

EXHIBIT 10, Termination of Consent Decree Press Release, 8/25/2014

EXHIBIT 11, DPD Policy Directive 203.11

EXHIBIT 12, Bruner Trial 2, TR 2/24/2020 Opening Statement

EXHIBIT 13, Bruner Trial 2, 3/4/2020 Closing Argument

EXHIBIT 14, Weiler Witness Statement and Photo Array

EXHIBIT 15, Mack Witness Statement and Photo Array

EXHIBIT 16, White Witness Statement and Photo Array

EXHIBIT 17, Price Witness Statement and Photo Array

EXHIBIT 18, Smith Witness Statement and Photo Array

EXHIBIT 19, Lawson Trial, 12/1/2014, TR Excerpt

EXHIBIT 20, Register of Actions, Case No. 14-008324-01

## INTRODUCTION AND BACKGROUND

Carl Bruner and Michael Lawson were tried jointly, before a single jury.[1] The jury convicted Bruner of first-degree premediated murder, MCL 750.316(1)(a); assault with intent to commit murder, MCL 750.83; felon in possession of a firearm, MCL 750.224f; and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.  The jury convicted Lawson of second-degree murder, MCL 750.317, and assault with intent to commit murder.

Lawson and Bruner's convictions arose for the shooting of two security guards outside the Pandemonium nightclub in Detroit. One guard, Marcel Jackson, was fatally shot.  Another guard, Wayne White, Jr., was struck in the back by a gunshot, but he was not injured because he was wearing a bulletproof vest. Witnesses testified that defendant Bruner was ejected from the nightclub for fighting.  After he was ejected, he continued to behave erratically and threatened that he would return. Witnesses observed Bruner in the vicinity of the nightclub for approximately the next two hours.  After the nightclub closed, Bruner was observed in the passenger seat of a gray Charger, driven by Lawson, which circled the block. At a certain point, the passenger's seat was empty. Lawson then exited the driver seat while talking on the telephone. White and another guard looked around for Bruner.  They heard the racking sound of a gun behind them and then gunfire erupted.

---

[1] The procedural history and background are taken from the unpublished opinion of the Michigan Court of Appeals, Case No. 326542, dated October 11, 2016.

1

The prosecutor's theory at trial was that Bruner was the shooter and that he was aided and abetted by Lawson. Bruner's theory at trial was that he was not present and was misidentified. Lawson's theory was that he was present at the scene but was not otherwise involved in the commission of any criminal offense.

## APPELLATE HISTORY

A claim of appeal was filed by Lawson on March 23, 2015, following his conviction on December 4, 2014. On October 16, 2015, the appeal was consolidated with the appeal of his codefendant Carl Bruner, to advance the efficient administration of the appellate process. On October 11, 2016, in an unpublished opinion, the Michigan Court of Appeals affirmed the decision of the trial court but remanded his sentencing for further consideration. The amended sentencing on April 12, 2019, made no material difference from the original sentence.

On July 17, 2017, Lawson filed Application for Leave to Appeal, which was denied on January 20, 2021. The order was without prejudice to Lawson's ability to file a motion for relief from judgment pursuant to MCR 6.501 et seq. that may include any claim of actual innocence or newly discovered evidence. This motion follows.

## NEW TRIAL FOR CO-DEFENDANT BRUNER

In a unanimous opinion by the Michigan Supreme Court, in lieu of granting leave to appeal, the Court held that the admission at a joint trial with a single jury of an unavailable witness's prior testimony about a codefendant's confession violated Bruner's constitutional right to confrontation. Carl Bruner, Lawson's co-

2

defendant, was therefore granted a new trial, which began on or about February 24, 2020. This time, the trial was conducted by a new prosecutor, new defense counsel, and a new judge, the Honorable Miriam Saad Bazzi, presiding. The trial concluded on March 6, 2020, resulting in Carl Bruner's acquittal on the charges.

Unlike the first trial, defense counsel obtained through discovery, the case notes of the officer in charge (OIC), Nancy Foster, who maintained a chronological listing of notes of the investigation that included significant impeachment evidence of portions of her testimony from the first trial.

In addition, in contrast of the first trial, Wesley Webb, who is the only witness that placed Bruner and Lawson at the scene with a gun,[2] testified at the trial, instead of prior statements being admitted from his preliminary examination testimony. Webb's compelling testimony at the subsequent trial called into question the veracity of the officer-in charge, and the legitimacy of the evidence used against Bruner and Lawson in the first trial. Mr. Lawson should be granted a new trial, to include any of the newly discovered evidence, which will demonstrate the government's suppression of evidence and misconduct. A new trial should be granted because the declaration of Wesley Webb as unavailable for the Lawson trial was erroneous. The prosecutor for the second trial stated that they had taken "extensive measures"[3] to find Mr. Webb and were successful despite the passage of

---

[2] Webb did not offer the fact that Lawson described Bruner having a gun or committing a shooting, but his testimony was impeached with his police statement, which he said Lawson described Bruner coming back with a gun. At the new trial, Webb stated, that he signed the statement to get special consideration for the charges he was facing and instead of receiving jail time he received probation. He denied ever stating this fact and frankly testified about Officer in Charge Nancy Foster placing that in the statement and committing several other acts of misconduct to win a conviction. *Exhibit 1, TR Bruner 2, 3/2/20 Webb p.38.*

[3] *Exhibit 2, Witness Detainer Hearing, 2/27/2020, p. 5.*

some eight years since the incident. However, the prosecutor who had contact with Webb and his attorney were unsuccessful locating him in closer proximity in time to the first trial.

Mr. Webb's attorney argued on his behalf, that he had no knowledge of the prosecution attempting to serve him. *Exhibit 2, p.6*. Webb stated on the record, "I never knew about the first trial, when it was or nothing." *Id. at p. 7.* He testified "I'm still in Detroit," meaning he was available, just as he was for the second trial. *Id.* He never received a subpoena, and he succinctly stated, "If I didn't know about it, how could I show up for it?" *Id.* The Court posed the question, "Was he actually served with a subpoena in the first trial." *Id. at p. 8*. Webb quickly responded, "no", which was confirmed by DPD Sergeant White, who stated on the record, in response, "No. He was for the exam[,] but I don't believe for the trial, your Honor." *Id. at p.8*. A new trial will illustrate the actual innocence and prejudice to Mr. Lawson. His criminal liability is derived completely on the culpability of Mr. Bruner. The new same evidence that led to an acquittal for Bruner should be permitted in a second trial for Mr. Lawson as matter of due process.

## LEGAL ARGUMENTS

### A. *Standard of Review*

A reviewing court will review a trial court's decision on a motion for relief from judgment for an abuse of discretion and its findings of facts supporting its decision for clear error. *People v Swain,* 288 Mich App 609, 628; 794 NW2d 92 (2010). Motions for relief from judgment are governed by MCR 6.500 *et seq. Id. at*

*629*. As a general rule, a defendant is entitled to file only one motion for relief from judgment. *MCR 6.502(G)(1)*.

The trial court should promptly examine the motion "together with all the files, records, transcripts, and correspondence relating to the judgment." *MCR 6.504(B)(1)*. If upon such review, "it plainly appears from the face of the materials [presented] that the defendant is not entitled to relief," the trial court "shall deny the motion without directing further proceedings." *MCR 6.504(B)(2)*. If it does so, the trial court "must include a concise statement of the reasons for the denial." *MCR 6.504(B)(2)*.

Historically, Michigan courts have been reluctant to grant new trials, on the basis of, newly discovered evidence. *People v. Grissom*, 492 Mich 296, 821 NW2d 50 (2012)(quoting *People v. Pizzino,* 313 Mich 97, 109, 20 NW2d 824 (1945), citing *Canfield v. City of Jackson,* 112 Mich. 120, 123, 70 N.W. 444 (1897)). This policy is consistent with requiring parties to use due care, diligence, and vigilance in securing and presenting evidence. *Pizzino, supra*, 313 Mich at 109, 20 NW2d 824.

The Courts have identified several evaluative criteria to apply when determining whether a new trial may be granted because of newly discovered evidence. The Courts have required a defendant to demonstrate that: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial. *People v. Clark,* 363 Mich.

643, 647, 110 NW2d 638 (1961); *Canfield,* 112 Mich at 123, 70 NW 444.

In *Spray v. Ayotte,* 161 Mich. 593, 593–595, 126 N.W. 630 (1910) the Court added a caveat to the four-part test in the context of newly discovered *impeachment* evidence, noting that "[o]rdinarily a new trial will not be granted because of newly discovered evidence to impeach a witness." *Id at* 595. Like the traditional four-part test, *Spray* 's caveat has also endured since its inception. *Luckhurst v. Schroeder,* 183 Mich. 487, 499–500, 149 N.W. 1009 (1914) ("Ordinarily, the court will not grant a new trial on the ground of newly discovered evidence where that evidence is for the purpose of impeachment."), citing *Spray,* 161 Mich. at 593–595, 126 N.W. 630; *People v. Serra,* 301 Mich 124, 133, 3 NW2d 35 (1942) ("A new trial will not ordinarily be granted because newly discovered evidence to impeach a witness."), citing *Spray,* 161 Mich 593, 126 NW 630; see also *People v. Barbara,* 400 Mich 352, 363, 255 NW2d 171 (1977) ( "Generally, too, where the new evidence is useful only to impeach a witness, it is deemed merely cumulative."). Therefore, if the evidence is merely cumulative, newly discovered evidence would not satisfy the four-part test for granting a new trial. Nonetheless, *Barbara, supra,* noted that new impeachment evidence was "particularly significant when ... the only evidence that an offense was ever committed was largely based on the testimony of individuals whose credibility might be put into question by these new witnesses." *Barbara,* 400 Mich at 363–364, 255 NW2d 171.

In *People v. Barbara*, 400 Mich 352, 255 NW2d 171 (1977), the Defendant Barbara was convicted of extortion and filed a motion for new trial based on the

6

claim that the witness had lied, and to support the claim offered two new witnesses and evidence of polygraph tests passed by himself and one of the two new witnesses. The trial court denied the motion and the Michigan Court of Appeals denied leave to appeal. The Michigan Supreme Court granted leave and held that in a postconviction hearing on a motion for new trial, based on newly found evidence the judge may, in his or her discretion, consider the results of polygraph examination. The Court reasoned that the discovery that testimony induced at trial was perjured may be grounds for ordering a new trial. *Barbara, supra,* at 363 (quoting 58 Am.Jur.2d, New Trial, s 175, p. 391).

In *People v. Armstrong,* 490 Mich. 281, 806 NW2d 676 (2011), the Michigan Supreme Court reconsidered the significance of impeachment evidence and its use as grounds for granting a new trial. The Court concluded that a defense attorney's failure to introduce telephone records that contradicted the complainant's trial testimony amounted to ineffective assistance of counsel and was sufficient for a new trial. The Court noted that the importance of evidence attacking the complainant's credibility because "[t]he defense's whole theory of the case was that the complainant had falsely accused defendant of rape. The attacks on the complainant's credibility at trial were inconclusive, providing mere 'he said, she said' testimony contradicting the complainant's version of the events." Thus, the impeachment evidence was found to be sufficiently important to the determination of guilt or innocence that it could change the result on retrial. Under those circumstances, the Court held that a defendant might be entitled to a new trial.

In this instance, Lawson's defense counsel's failure to obtain progress notes of the investigation, in addition to the failure of the prosecutor to identify and disclose them, when there was an affirmative constitutional duty of DPD to identify, and for the prosecution to produce them, is a violation of DPD policy, under *Brady v Maryland*, 373 US 83 (1963) and *Giglio v. US*, 405 US 150 (1972). Consistent with DPD policy, pursuant to directive number 102.10, it is a requirement of the Detroit Police Department to follow Brady/Giglio disclosure requirements. As such, it was DPD's duty to (1) identify and provide to the prosecution any exculpatory evidence and Brady/Giglio material that would have a reasonable probability of altering the results in a trial, or any material that could reasonably mitigate the sentencing of a defendant, and, (2) any material relevant to the credibility of government witnesses, including but not limited to, law enforcement officers. ***Exhibit 3, DPD directive 102.10.***

**B.** **_Brady Violation_**

The United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. In identifying the essential components of a *Brady* violation, the Supreme Court has articulated a three-factor test: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and, (3) prejudice

must have resulted. *Strickler v. Greene,* 527 U.S. 263, 281–282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).  Stated succinctly, the components of a "true Brady violation," are that: (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material. *Id.*

There is ample case law to provide a framework for analysis on these elements. For instance, the government is held responsible for evidence within its control, even evidence unknown to the prosecution, *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), without regard to the prosecution's good or bad faith, *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."). Evidence is favorable to the defense when it is either exculpatory or impeaching. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Given the evidence of misconduct in the prosecution of this case, there is ample evidence to support a determination that a new trial should be granted as a matter of due process, in the interest of justice.

## C. *Suppression of Evidence by DPD and the Prosecution*

In this instance, the Detroit Police Department (DPD) and the prosecution failed to identify, disclose, and produce the progress notes of the investigation.

According to DPD policy, 102.10-2,[4] the department requires adherence to
Brady/Giglio disclosure requirements consistent with the law. ***Exhibit 3***.  This
policy relates to any material relevant to the credibility of a government witness,
including law enforcement officers.  Pursuant to DPD policy 102.10 -4, all members
must disclose Brady/Giglio material, without a specific request by the trial
prosecutor handling a case in which the member is an intended government
witness. ***Id.***

### 1.    *Suppression of Case Tracking Notes/Progress Notes*

The officer in charge (OIC), Nancy Foster, maintained within the DPD
computer system, a chronological listing of progress notes of the investigation that
included significant impeachment evidence of portions of her own trial testimony.
***See Exhibit 4, DPD Case Tracking Notes or Progress Notes.*** By any measure,
the case tracking notes are part of the investigation file and should have been
produced by the prosecution.  Case Tracking Notes[5] are a systematic tool used by
DPD that chronicles the progress of a particular case, where the investigator places
truthful, and sometimes candid assessment of the investigation. ***Exhibit 5, Bruner
Trial 2, 3/3/20, TR Foster pp.96-97.***

Review of the progress notes outline the priorities and direction of the
investigation from the very beginning.  For instance, the first notation in the notes,

---

[4] While the precise policy was not in effect at the time of the investigation, the case law which forms the basis for
the policy were well-established at the time of the incident. The policy states, that the disclosure requirements
were are consistent with law mandated by these decisions from nearly 50 years ago.

[5] ***See Exhibit 4, DPD Case Tracking Notes or Progress Notes***, including entries of Officer in Charge Nancy Foster.
These notes were never produced prior to the Lawson trial.  In a subsequent trial for Co-defendant Carl Bruner, the
progress notes proved to be invaluable in identifying both impeachment and exculpatory evidence.

on the date Foster was assigned to the case, indicates that the investigators went to the General Motors (GM) building and spoke with Douglas Rhodes, regarding surveillance video to assist in the identification of a suspect and vehicle involved. This was the genesis of a campaign to canvass the community for video footage.[6] Specifically, the progress notes, if they were produced, would have contradicted her trial testimony about acquiring video footage from St. Andrews Hall, an adjacent night club west of the scene of the crime, which potentially contained exculpatory evidence. While the notation contained in the case tracking notes would ordinarily not be material, there are other cues that lead to the inescapable conclusion that other exculpatory evidence was being suppressed.

The notation from June 28, 2012, indicates that she began showing photo arrays to witnesses, based on her little information, and she was successful obtaining video footage from Greek Town Casino. *Exhibit 4, Case Progress Notes*. The following day, on June 29, 2012, Foster checked with the People Mover for possible video surveillance, where she spoke to Portland Works, the Field Operation Manager, but the video did not cover the area in question. *Id*. On June 30, 2012, at that early stage of the investigation, Foster brought Lawson in for questioning as a person of interest (POI). *Id*.

### 2.   *Suppression of Video Tape Evidence from St. Andrews Hall*

At the Lawson jury trial, the prosecutor elicited the attempts that the OIC

---

[6] Extraordinarily, Foster began her campaign to frame Bruner and Lawson at the inception. The very first notation indicates that she completed photo arrays of possible suspects from the cell phone discovered by Club Pandemonium belonging to Carl Bruner.  Notation of 6/21/2012. *See Exhibit 2*.

Nancy Foster went through to obtain third party video footage from businesses in the area. The OIC testified that she inquired with Greektown Casino, Blue Cross Blue Shield and the People Mover.  The OIC testified that she recovered video from Greektown Casino (marked as Exhibit 69), and Blue Cross Blue Shield (marked as Exhibit 70). *See Exhibit 6, Lawson Trial, 11/26/2014 TR Foster, pp. 53-55.* Indeed, in the progress notes, she identified, in each instance, that she obtained the video from the respective security personnel at each site. *Exhibit 4.*

At trial, after establishing that the People Mover did not have video, the prosecutor asked, were there any other locations that she tried to obtain video and she replied "no". *Ex 6, TR p.56, ln 18*. The first attempt at suppressing the St. Andrews Hall evidence.  Knowing that the responsive testimony was false, the prosecutor specifically asked about Saint Andrews Hall (which is next door to scene of the crime).  Nancy Foster (OIC) testified, "*I went there and I did get a little video surveillance from Saint Andrews Hall*." *Ex. 6, TR p.56, ln 20-21* (emphasis added).[7] Surprised by the answer, and in an effort to prompt a different response, the prosecutor asked a rhetorical question in disbelief, "You did?" Realigning her testimony with the prosecutor, Foster equivocated, "I believe I did." *Ex. 6, TR p. 56 ln. 23*.

Foster quickly rehabilitated herself in line with the prosecutor's direction to indicate that there was no video recovered from St. Andrews.  However, there are several contradictions that impeach that contention.  First, the Case Tracking notes,

---

[7] Use of the term "little video surveillance" was to make it sound trivial and insignificant, but it still doesn't excuse the suppression of the evidence (no matter how "little" whatever that was meant to convey).

which were not disclosed in the Lawson trial, refuted that contention. In a notation dated June 20, 2014, the progress notation states, received surveillance video from Club Pandemoium (sic)(Kathey Schuarski) and St. Andrews (Tom Smith). ***Exhibit 4***. Significant to note, only Tom Smith of St. Andrews Hall has been included on the government's witness list from the beginning.  Indeed, Tom Smith was likewise included on the witness list in the retrial of Carl Bruner, years after DPD stated that St. Andrews Hall had no video footage. ***See Exhibit 7***.[8]

### D.   *Wrongful Conviction Caused by Erroneous Identification*

Erroneous eyewitness identifications have plagued our criminal justice system since its inception. *Michael Cicchini, Joseph G. Easton, Reforming the Law on Show-Up Identifications*, 100 J.Crim. L. & Criminology 381, 385 (2010). Studies now reveal that erroneous eyewitness identifications "are the single greatest cause of wrongful convictions in the United States and are responsible for more wrongful convictions than all other causes combined." *Id.* (*quoting State v. Dubose*, 699 N.W.2d 582, 592 (Wis. 2005)).  Research shows that approximately 40% of all eyewitness identifications are mistaken. *Id. at 386.*  Notwithstanding these risks involved, DPD operates with an indifferent attitude toward eyewitness identifications.

One of the biggest contributors to eyewitness misidentifications is the way in which the investigator presents the suspect perpetrator to the witness. At the time

---

[8] By comparing the progress notes (***Ex. 4***) with the witness list *(Ex. 7)*, will reveal that Douglas Rhodes from the GM Building, and Portland Works from the People Mover, who did not have probative video footage, are conspicuously absent from the witness list, although Tom Smith's name remains, even for the retrial eight years after denying the existence of the video. ***Ex. 7, Prosecution Witness List.***

13

the investigator prepares a lineup, whether it be in a 6-person photo array or otherwise, just knowing who the suspect is problematic. Often, a police officer might inadvertently use subtle clues through pauses, hesitations, gestures, or smiles, which may subconsciously taint the witness's ability to pick a familiar face. It is widely accepted, that the better practice is to use a double-blind procedure. The officer showing the photographs to the witness should not know the identity of the suspect. In such a scenario, it is impossible for the officer to inadvertently influence a witness in picking out a perpetrator.

### 1. *Failure of DPD to Use Double Blind Procedure as a Best Practice*

Poor eyewitness identifications are a problem across the country, and reforms are possible, with many jurisdictions making changes to policies and procedures to ensure fairness and reliability. For example, in 2017, New York state's Criminal Procedure Law (CPL) was amended to permit the admissibility of photo array evidence where the procedure was conducted with safeguards to ensure accuracy. As a result of these changes, the prosecution is now permitted to introduce testimony in a case by the person who made a photo identification, provided the procedure was conducted in a double-blind or blinded manner.[9] *See Model Policy, MPTC, June 2017, Executive Law 837 (21).* In some jurisdictions, like the State of New Jersey, the Attorney General issued guidelines restricting the primary investigator from participating in the presentation of a photo lineup:

> **In order to ensure that inadvertent verbal cues or body language do not impact on a witness, whenever practical, considering the time of**

---

[9] *See* https://www.criminaljustice.ny.gov/pio/press_releases/ID-Procedures-Protocol-Model-Policy-Forms.pdf at p.1.

**day, day of the week, and other personnel conditions within the agency or department, the person conducting the photo or live lineup identification procedure should be someone other than the primary investigator assigned to the case**.

*See NJ Att'y Gen Guidelines For Preparing and Conducting Photo and Live Lineup Identification Procedures.*[10] In larger police agencies all over the country, it is recommended that a separate independent person present the photo array as opposed to the person who prepared it. For example, in Baltimore, Maryland, the double-blind/sequential presentation is the required method to be utilized for all photographic arrays. *See Baltimore Police Department, Policy 1009, August (2016).*[11] Any deviation from that general policy must be approved by a permanent-rank lieutenant or above. *Id.*

While these reforms are taking place across the nation, most of the State of Michigan has taken notice and likewise progressed. Since 2012, the Michigan Commission on Law Enforcement Standards recognized the research findings, which include academic studies and court precedent, supporting the double-blind, sequential process for lineups and show-ups as a best practice.[12] *Michigan Commission on Law Enforcement Standards, Eyewitness Identifications, April (2014).* The sequential, double-blind process is endorsed by the State Bar of Michigan, the National Innocence Project, and the Michigan Commission on Law Enforcement Standards (MCOLES) *Id.*

---

[10] *See https://www.state.nj.us/lps/dcj/agguide/photoid.pdf.*

[11] See *https://www.baltimorepolice.org/1009-double-blindsequential-photographic-array-procedures*
[12] *See* https://www.michigan.gov/documents/mcoles/MCOLES_April_2014_453954_7.pdf

Even the Prosecuting Attorneys Association of Michigan has issued its own Best Practices Recommendation and Eyewitness Identification and Procedures. *Prosecuting Attorney Assoc. of Michigan, April (2015).*[13] In so doing, the organization counsels police agencies to provide their officers with training on photo array and live lineup administration. In addition, they admonish agencies to *provide law enforcement officers with training on the variables that affect eyewitness identification, on practices for minimizing contamination, and on effective eyewitness identification protocols. (emphasis added).* The association states, "[t]o the extent practicable, considering the size of the agency as well as personnel and staffing issues, all law enforcement agencies should adopt double-blind or blinded administration of both photo arrays and live lineups as a preferred practice."

In 2012, the State Bar of Michigan adopted a policy writing guide entitled Law Enforcement and Eyewitness Identifications. ***See Exhibit 9.*** The overall purpose of the policy and procedure offered was to identify the most fair and unbiased set of procedures that should be applied to eyewitness identifications. It was the stated policy of the State Bar of Michigan to conduct eyewitness identification in a manner most likely to assess witnesses' true and reliable recollections in compliance with state and federal constitutional requirements. ***Id. at p.5.*** As such, the double-blind procedure, in which neither the officer conducting

---

[13] *See https://pceinc.org/wp-content/uploads/2017/10/20160415-BestPracticesRecommendationEyewitnessIdentificationandProcedures-ProsecutingAttorneysAssociationofMichigan.pdf*

the lineup, nor the witness is aware of the suspect's identity was marked as the preferred method. *Id.*

As the Supreme Court has recognized, a "witness' recollection of the stranger can be distorted easily by the circumstances or by later actions of the police," *Manson v. Brathwaite*, 432 U.S. 98, 112 (1977), and "'[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor – perhaps it is responsible for more such errors than all other factors combined.'" *United States v. Wade*, 388 U.S. 218, 229 (1967). See also *Perry v. New Hampshire*, 565 U.S. 228, 245 (2012) ("'the annals of criminal law are rife with instances of mistaken identifications'" (quoting Wade, 388 U.S. at 228)).

At the time of the incident, the City of Detroit police department was under a federal consent decree, which started in 2003 and mandated continued policy reforms in the area of witness identification until the announcement of the termination of the Consent Decree on August 25, 2014. *See Exhibit 10, Consent Decree Termination Press Release.* DPD introduced a new policy on October 1, 2014, although the core of the policy was in place during the Bruner/Lawson investigation under the Consent Decree. *See Exhibit 11, DPD Policy Directive 203.11.*

### 2. *DPD Procedure and Policy for Photo Array Identification*

In accordance with DPD policy (under the consent decree at the time) directive 203.11-3(1c), "[e]ach witness should view the photographs alone so that

other witnesses will not be influenced or open to suggestion." In addition, in accordance with DPD directive 203.11-3(1g), "[w]hen there are several witnesses, only one (1) or two (2) witnesses should view photographs, the remaining witnesses should be used for the live show up." In compliance with directive 203.11-3 (5), "[i]n any lineup or show up, the proceeding must be conducted in a fair manner, so as not to be unduly suggestive of the suspect." Officers should refrain from making any remarks once the witness begins to view the photos. This is important because any remarks could later be interpreted as an attempt to influence the identification. *Id.* While the policies were formed to bring fairness to the process, departure from the policy only heightens the scrutiny that should be applied in reviewing the process. In accordance with the DPD policy, where a witness identifies the suspect through the use of photographs, the totality of the circumstances test should be used to determine whether the photographs and the process itself are unnecessarily suggestive. *Exh.11, 203.11-3(7).* Here, when viewing the totality of the investigation and the process used by DPD and Sgt. Foster, the only logical conclusion is the process was unconstitutional and a violation of due process rights.

### 3. *Witness Inconsistencies in Identification of Bruner*

The underlying premise of the prosecution's case against Carl Bruner[14] was that Bruner returned to the club in retaliation for the security team's rough handling

---

[14] Although the argument centers around Carl Bruner, his acquittal calls into question the conviction of Lawson, who was accused of aiding and abetting Bruner. Realistically, there could be no aiding and abetting by Lawson if the underlying crime was not committed by Bruner.

and throwing him out after a fight with a patron of the club, Ms. Kyrianna Weiler.[15]
***Exhibit 12, TR 2/24/2020 Opening Statement, pp. 7-8***; *see also **Exhibit 13, TR***
***3/4/2020 Closing Argument, p. 5***. The prosecution, in their closing argument at
the second trial, contended that "[h]e grabbed a woman on the buttocks; somehow
he thought a sexual grabbing was appropriate." ***Exhibit 13, pp. 7-8., Exhibit 10***
***at p.12***.

However, the inconsistencies with the identification of Bruner as that assailant
in that incident renders the theory for a motive for murder unavailing.  It should be
noted that several other people were ejected from the club that evening. ***See***
***Exhibit 15, Mack Statement (about 6 people were ejected).***

***Inconsistent Witness Descriptions of Assailant Presumed to be Bruner***

| Witness | Stated Time of Ejection | Bruner Identification | Clothing/characteristics | Photo Array Presented |
|---|---|---|---|---|
| Kyrianna Weiler[16] | Arrived at club about 1:15 a.m. | med complexion, small guy | Black polo black shirt, goatee, fade hair cut | 6/28/12 7:15 pm by Foster |
| Wayne White, Jr.[17] | Not present | 5'6-5'7" ft tall 160lbs May be some facial hair | White t-shirt and black shorts when ejected Black t-shirt and black shorts after closing | 6/28/12 10:05 pm by Foster |
| Deandre Mack[18] | 12:30 a.m. | 6'2" ft. tall light skinned | White shirt, blue jeans | 6/28/2012 11:03 pm by P.O Kimble |

---

[15] Although the prosecutor omits her name in the argument, they deliberately continue to describe the incident with Weiler, without calling her as a witness in either trial. ***Exhibit 13, TR 3/4/2020, Closing Argument, p. 11-12;*** ***see also Exhibit 14, Witness Statement of Weiler, for a description of the incident.***  Although they used her incident to form a motive for the crime, Weiler never identified Bruner or Lawson, nor did she accurately describe Carl Bruner as the assailant. Furthermore, her timeline does not match the testimony offered by the security team. ***Exhibit 14.***

[16] ***Exhibit 14, Weiler Statement and Photo Array***

[17] ***Exhibit 16, White Statement and Photo Array***

[18] ***Exhibit 15, Mack Statement and Photo Array***

| Darnell Price[19] | 12:30 a.m. | 6'2" ft. tall 180lbs. Med complexion | Black polo shirt, blk shorts | 6/28/2012 11:04 p.m. by Foster |
| Dennis Smith[20] | No time given; incident on 2nd floor | 5'10" ft tall 190 lbs. Med complexion | Identifies Lawson as person he gave the cell phone. No clothing described | 6/28/20212 11:12 p.m. by Foster |

The witness inconsistencies describe different assailants, wearing different clothing, and at different times. According to the assault victim Weiler, she didn't arrive to the club until 1:15 am, because she wanted to come in for free entry (at the end of the event). However, the incident that the security team describes occurs nearly an hour before she even arrived at the club. If Bruner was ejected at 12:30 am, as the security team suggests, Weiler wasn't present at the club. Furthermore, Weiler described her assailant with a black polo shirt, while Wayne White and Deandre Mack described Bruner with a white shirt. Even more troubling, White described Bruner with having black shorts and Deandre Mack described him with a white shirt with blue jeans. And even more perplexing, witness Darnell Price matched the black polo shirt, similar to Weiler, but described him as 6'2" tall, in contrast to Weiler's description of a short guy.

The photo identification of Bruner as the assailant and would-be shooter is significantly compromised by the inconsistencies coupled with the notion that the photo arrays were presented by the Foster the officer in charge of the investigation, who presented all but one of the photo arrays. When you consider that Webb

---

[19] *Exhibit 17, Price Statement and Photo Array*

[20] *Exhibit 18, Smith Statement and Photo Array*

testified that she made verbal gestures to coach him into the identification, during his photo array presentation, leads to one inescapable conclusion, that Foster tainted the investigation with an unconstitutional suggestive photo array.

In this instance, the officer in charge, Nancy Foster, managed to conduct all but one of the presentations of the photo arrays to each witness. The photo arrays occurred on the same date, presumably at the same location, in tandem. This process appears to be in serious violation of the spirit and intent of many of the objectives outlined in DPD Policy Directive 203.11. *See Exhibit 11*.

### 4. *Foster's Direct Misconduct in the Identification of Bruner*

In this case, in a subsequent trial of co-defendant Carl Bruner, the only eyewitness that identifies Bruner as the shooter is government witness Wesley Webb, who gave a chilling and disturbing account of misconduct by DPD officer in charge Nancy Foster. The other witnesses could only identify Bruner as a person that was ejected from the club that evening (albeit only one of many); as the person outside of the club that evening, and as a person seen at the door asking for his keys and phone. Wesley Webb candidly testified that he did not initially identify Bruner in the photo array. *Exhibit 1, TR Bruner 2, 3/2/20 p.30, ln 1-5.* Webb stated, that after he did not pick Bruner, OIC Foster, presenting the photo array, placed her hand on the guy that looked like Bruner. *Id*. Webb openly admitted that when he chose someone else, Foster stated, "are you sure that's him?" while placing her hand down by another picture; leading Webb to think, that this [Bruner] is the one she wants me to pick. *Id.* It is evident that Foster deliberately provided non-verbal

21

cues to Webb to identify the shooter. It is abundantly clear that Webb was Foster's only link to Bruner being the shooter, thus, the only nexus to Lawson in proving aiding and abetting. Prior to having Webb as a witness, on July 19, 2012, DPD case tracking notes stated:

> "At this point, no one has been able to ID anyone as the shooter. Just Carl Bruner II being put out of the club and the passenger inside of a Gray Dodge Charger that was circling the club before the shooting and Michael Lawson being the driver of the Gray Dodge Charger."

*Exhibit 4, pg. 2, dated 7/19/2012.*

After the above notation in the progress notes, there was no activity in the progress notes until later, when Webb was influenced into making a positive identification of Bruner. Webb frankly testified that he told DPD at the onset that he didn't believe Lawson's story. *Exhibit 1, TR 3/2/2020 Webb, pg.36, ln 2-4.* Webb honestly admits that he signed the statement to get special consideration for the charges he was facing serious jail time and instead received probation. *Id. at pg. 38, ln 19-22; Exhibit 8, Webb Proper Agreement.* Webb admits that he didn't know anything about a gun, but that is what OIC Foster wrote for his statement – and he just signed it.[21] *Exhibit 1, p. 38.* In essence, Webb contradicts and recants his prior testimony, which was given under the duress and fear of his own penal interest. The prosecution failed to subpoena Webb for trial, fearing that

---

[21] Q: So, you don't know anything about this gun, but you do know what Officer Foster wrote in this statement, right? A: Yes
Q: You signed this statement, so you could get special consideration, correct, sir? A: Yes
*Exhibit 5, p.38.*

he would reveal the full context of his testimony. *Ex. 2, p. 8*. Even DPD had to admit that Webb was never even subpoenaed to appear. *Id*.

### 5. *Webb Should Not be Declared Unavailable*

Under MRE 804(a)(5), "unavailability as a witness" includes situations in which the declarant: (1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or; (2) persists in refusing to testify concerning the subject matter of the declarant's statement **despite an order of the court to do so**; or (3) has a lack of memory of the subject matter of the declarant's statement; or (4) is unable to be present or to testify at the hearing **because of death or then existing physical or mental illness or infirmity**; or (5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means, **and in a criminal case, due diligence is shown.** (*emphasis added*). A declarant is not unavailable as a witness if exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying."

In justifying the use of the prior testimony, the prosecution offered, without any sworn testimony of a witness under oath, that they exercised due diligence to find Mr. Webb. The same prosecutor believed to have suppressed material evidence, stated on the record, that his phone calls to Webb were going to voice

mail, the OIC Nancy Foster, allegedly went to his residence, and she checked the hospital. *See Exhibit 19, Lawson Trial, 12/1/2014 TR Excerpt*. The Court erroneously accepted the statements of the prosecutor as truth, without a single witness testifying to the efforts made to locate Webb. *Id*. The prosecutor never advised the Court that Mr. Webb was properly served by personal service, or certified mail, in advance of the trial with a subpoena or court order. In the words of Wesley Webb, "[i]f I didn't know about it, how could I show up for it?" *Exhibit 2, p. 7.* He is exactly right. Despite the passage of years, the DPD was able to locate Mr. Webb for the second trial, some six year later. But the prosecution, who was in negotiations with Mr. Webb and his attorney, concerning a pending plea deal, couldn't manage to locate him months after striking the plea deal. After all, he was sentenced to probation on July 22, 2014. *See Exhibit 8*. And Webb appeared for the preliminary examination held on September 23, 2014, less than two months before the pre-trial and the beginning of the trial on November 19, 2014. *See Exhibit 20, Register of Actions*. The court failed to require the prosecution to demonstrate good cause through a finding of diligence in locating Mr. Webb for testimony at the trial, which is sufficient grounds to grant Lawson a new trial.

## CONCLUSION

Given the suppression of material evidence in the first trial and the improper procedures used to identify Bruner as the shooter; coupled with the utter lack of evidence to demonstrate Lawson's role in aiding and abetting, without the testimony of Wesley Webb, who called into question the complete integrity of the case presented

on behalf of the State, there is ample evidence to support the granting of a new trial for Lawson. The new evidence presented in the second Bruner trial should be presented here, including the riveting and frank testimony of Wesley Webb, which made a significant departure from his preliminary examination testimony and was concealed by the prosecution with a cloak of "unavailable" unsubstantiated by sworn testimony. Therefore, we ask the Court to grant a new trial in this matter in the interest of justice and consistent with the standards set forth in the U.S. Constitution as well as the State of Michigan Constitution.

Respectfully submitted,

\_\_\_\_/s/ Lillian F. Diallo _____
LEGAL WARRIORS, PLLC
Lillian F. Diallo (P52036)
*Counsel for Defendant*
500 Griswold Street, Suite 2340
Detroit, MI 48226
(313) 965-6633 Fax (313) 965-9858
lilliandiallo@sbcglobal.net

and

WILDER LEGAL GROUP, PLC
Marvin D. Wilder (P53871)
*Co-Counsel for Defendant*
500 Griswold Street, Suite 2340
Detroit, MI 48226
(313) 731-6081
mdwilder@wilderlegal.com

Date: November 1, 2021